# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| RETHINK 35, TEXAS PUBLIC INTEREST RESEARCH GROUP, and ENVIRONMENT TEXAS, | § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Case No. 1:22-cv-00620-DAE |
| TEXAS DEPARTMENT OF TRANSPORTATION; MARC D. WILLIAMS, in his official capacity as Executive Director of the Texas Department of Transportation, | § § § § § § | |
| *Defendants.* | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney
General

SHAWN COWLES
Deputy Attorney General for Civil
Litigation

NANETTE M. DINUNZIO
Chief, Transportation Division

LISA MCCLAIN MITCHELL
Attorney-in-Charge
Texas Bar No. 90001724
CATHERINE R. FULLER
Texas Bar No. 24107254
*Admitted pro hac vice*
Assistant Attorneys General
Office of the Attorney General of Texas
Transportation Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1431 (Mitchell)
Email: lisa.mitchell@oag.texas.gov

RYAN P. BATES
Texas Bar No. 24055152
Bates PLLC
919 Congress Avenue, Suite 1305
Austin, Texas 78701
Telephone: (512) 694-5268
Email: rbates@batespllc.com

TABLE OF CONTENTS

**Page**

Index of Authorities ........................................................................................ iv

Glossary of Terms .......................................................................................... viii

Introduction ..................................................................................................... 1

Background ....................................................................................................... 1

I.   Legal Framework ..................................................................................... 1

II.  Factual and Procedural Background...................................................... 2

    A.   The I-35 Capital Express Program and the CapEx North and
        South Projects.................................................................................. 2

    B.   TxDOT's NEPA Review of the CapEx North and South Projects .......... 4

Standards Governing This Motion.................................................................. 6

Argument ......................................................................................................... 8

I.   TxDOT Did Not Improperly Segment the Projects Within the CapEx
    Program ..................................................................................................... 8

    A.   The North and South Projects Each Have Independent Utility .......... 10

    B.   Neither Project Restricts the Consideration of Alternatives in
        Each Other or Any Other Projects.......................................... 13

II.  TxDOT Conducted Appropriate Alternatives Analyses for the North and
    South Projects .......................................................................................... 16

III. TxDOT Gave the Necessary Hard Look to All Relevant Environmental
    Considerations in the North and South Project EAs...................................... 19

    A.   Noise Impacts ................................................................................. 19

    B.   Water Resource Impacts ................................................................. 22

    C.   Environmental Justice .................................................................... 23

    D.   Climate Change .............................................................................. 25

    E.   Construction-Related Impacts ....................................................... 27

F.      Cumulative Impacts ............................................................. 29

IV.   TxDOT Fulfilled All Public-Involvement and Full-Disclosure Obligations Under NEPA ................................................... 31

V.    Because Neither Will Significantly Affect the Environment, the North and South Projects Do Not Require Preparation of an EIS ........................... 34

Conclusion and Prayer ............................................................... 35

Certificate of Service.................................................................. 37

## Index of Authorities

**Cases**                                                                  **Page**

*Aquifer Guardians in Urban Areas v. Fed. Hwy. Admin.,*
    779 F.Supp.2d 542 (W.D. Tex. 2011) (*AGUA*) .................................. 9, 12, 13, 16

*Balt. Gas & Elec. Co. v. Nat. Res. Defense Council,*
    462 U.S. 87 (1983) .................................................................................. 31, 34

*Bellion Spirits, LLC v. United States,*
    393 F.Supp.3d 5 (D.D.C. 2019) ............................................................ 22, 23

*Blue Ocean Inst. v. Gutierrez,*
    585 F.Supp.2d 36 (D.D.C. 2008) ............................................................... 7

*Coal. for Adv. of Regional Transp. v. Fed. Hwy. Admin.,*
    959 F.Supp.2d 982 (W.D. Ky. 2013) ........................................................ 26

*City of Dallas v. Hall,*
    562 F.3d 712 (5th Cir. 2006) ............................................................... 16, 17

*Coliseum Square Ass'n, Inc. v. Jackson,*
    465 F.3d 215 (5th Cir. 2006) ............................................................... 23, 24

*Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.,*
    538 F.3d 1172 (9th Cir. 2008) .................................................................. 27

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) .................................................................................. 30

*Fath v. Tex. Dep't of Transp.,*
    No. 1:16-cv-00234-LY, 2017 WL 11633327 (W.D. Tex. Aug. 4, 2017) ... 9, 13, 16

*Fath v. Tex. Dep't of Transp.,*
    924 F.3d 132 (5th Cir. 2018) .............................................................. 9, 10, 30

*Gulf Restoration Network v. McCarthy,*
    783 F.3d 227 (5th Cir. 2014) ...................................................................... 7

*Hwy. J Citizens Grp. v. Mineta,*
    349 F.3d 938 (7th Cir. 2003) ........................................................... 8, 9, 10, 12

*Jicarilla Apache Tribe of Indians v. Morton,*
    471 F.2d 1275 (9th Cir.1973) .................................................................... 26

*La. Crawfish Producers Ass'n-West v. Rowan,*
    463 F.3d 352 (5th Cir. 2006) ...................................................................... 2

*La. Pub. Serv. Comm'n v. FERC,*
    761 F.3d 540 (5th Cir. 2014) ................................................................. 7

*Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.,*
    827 F.3d 452 (5th Cir. 2016) ................................................................. 7

*Marsh v. Or. Natural Res. Council,*
    490 U.S. 360 (1989) ............................................................................. 2

*Medina Cnty. Envt'l Action Ass'n v. Surface Transp. Bd.,*
    602 F.3d 687 (5th Cir. 2010) (*MCEAA*) ............................................. 7

*Miss. River Basin Alliance v. Westphal,*
    230 F.3d 170 (5th Cir. 2000) ............................................................. 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................... 7

*N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior,*
    983 F.3d 1077 (9th Cir. 2020) ........................................................... 26

*Native Ecosystems Council v. U.S. Forest Serv.,*
    428 F.3d 1233 (9th Cir. 2005) ..................................................... 16, 17

*N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.,*
    151 F.Supp.2d 661 (M.D.N.C. 2001) .......................................... 12, 13

*O'Reilly v. U.S. Army Corps of Eng'rs,*
    477 F.3d 225 (5th Cir. 2007) ............................................................ 8, 9

*Prairie Band Pottawatomie Nation v. Fed. Hwy. Admin.,*
    684 F.3d 1002 (10th Cir. 2012) ......................................................... 19

*Save Barton Creek Ass'n v. Fed. Hwy. Admin.,*
    950 F.2d 1129 (5th Cir. 1992) (*SBCA*) .......................................passim

*Sierra Club v. Espy,*
    38 F.3d 792 (5th Cir. 1994) ............................................................... 17

*Spiller v. White,*
    352 F.3d 235 (5th Cir. 2003) ........................................... 2, 19, 31, 35

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    255 F.Supp.3d 101 (D.D.C. 2017) ..................................................... 31

*Stuttering Found. of Am. v. Springer,*
    498 F.Supp.2d 203 (D.D.C. 2007) .................................................... 7, 8

*Sw. Elec. Power Co. v. U.S. Envtl. Prot. Agency,*
   920 F.3d 999 (5th Cir. 2019) ............................................................ 19

*Texas v. U.S. Envtl. Prot. Agency,*
   389 F.Supp.3d 497 (S.D. Tex. 2019) ............................................. 7, 8

## STATUTES & REGULATIONS

5 U.S.C. §704 ............................................................................................ 6

5 U.S.C. §706(2)(A) ................................................................................. 6

23 C.F.R. §771.111(f) ............................................................................. 8

23 C.F.R. §771.115(c) ............................................................................. 2

23 C.F.R. pt. 772 ..................................................................................... 19

23 C.F.R. §772.5 ............................................................................... 19, 20

23 C.F.R. §772.11(a) ....................................................................... 19, 20

23 C.F.R. §772.11(c)(2) .................................................................. 19, 20

23 C.F.R. §772.13(a) ............................................................................. 20

23 C.F.R. §772.13(d) ............................................................................. 20

23 C.F.R. §772.13(g) ............................................................................. 20

23 C.F.R. §772.13(h) ............................................................................. 20

30 Tex. Admin. Code ch. 213 ............................................................... 22

40 C.F.R. §1501.3(b) ....................................................................... 34, 35

40 C.F.R. §1501.5(c)(1) ........................................................................ 35

40 C.F.R. §1501.6(a) ............................................................................. 34

40 C.F.R. §1502.4(a) ............................................................................... 9

40 C.F.R. §1508.1(g)(3) ........................................................................ 29

40 C.F.R. §1508.1(h) ............................................................................... 1

40 C.F.R. §1508.1(z) ....................................................................... 16, 17

42 U.S.C. §4332(2)(C) .................................................................. 1, 4, 34

43 Tex. Admin. Code §2.101 ........................................................ 31

43 Tex. Admin. Code §2.105 ........................................................ 32

43 Tex. Admin. Code §2.107 ........................................................ 32

**OTHER AUTHORITIES**

Exec. Order 12898, 59 Fed. Reg. 7629 §3–302 (1994) ................................................. 23

TxDOT, *I-35 Capital Express: Events*,
    https://my35capex.com/news-events/events/ ..................................................... 32

TxDOT, *I-35 Capital Express: Program History*,
    https://my35capex.com/about/program-history/ ............................................. 2, 3

TxDOT, TECH. REPORT: STATEWIDE ON-ROAD GREENHOUSE GAS EMISSIONS
    ANALYSIS AND CLIMATE CHANGE ASSESSMENT (2018),
    https://ftp.txdot.gov/pub/txdot/get-involved/sat/loop-1604-from-sh16-i-
    35/091020-greenhouse-gas-report.pdf ............................................................. 26

GLOSSARY OF TERMS

| | |
|---|---|
| APA | The Administrative Procedure Act |
| ARN | The administrative record compiled for the CapEx North project and filed in this matter by TxDOT |
| ARS | The administrative record compiled for the CapEx South project and filed in this matter by TxDOT |
| BMP | Best management practice |
| CapEx | TxDOT's I-35 Capital Express Program |
| Compl. | Plaintiffs' Original Complaint (Dkt. No. 1) |
| Corps | United States Army Corps of Engineers |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EJ | Environmental justice |
| FHWA | The Federal Highway Administration |
| FONSI | Finding of No Significant Impact |
| GHG | Greenhouse gas |
| I-35 | U.S. Interstate Highway 35 |
| MSATs | Mobile source air toxics |
| NEPA | The National Environmental Policy Act |
| ROW | Right of way |
| SH 45N | State Highway 45 North |
| SH 45SE | State Highway 45 Southeast |
| SH 71 | State Highway 71 |
| SIU | Segment of independent utility |
| TAC | Texas Administrative Code |

| TxDOT | Defendant Texas Department of Transportation |
|-------|-----------------------------------------------|
| US 290E | U.S. Highway 290 East |
| US 290W | U.S. Highway 290 West |
| WOTUS | Jurisdictional "Waters of the United States" under the Clean Water Act |

## INTRODUCTION

The claims brought by Plaintiffs should be denied. Defendants, the Texas Department of Transportation (TxDOT) and Marc D. Williams, in his official capacity as TxDOT's Executive Director, did not violate the National Environmental Policy Act (NEPA) in finding that the North and South component projects within TxDOT's I-35 Capital Express Program would have no significant impact on the environment.

TxDOT undertook an exhaustive, scientific, years-long review of the effects of the North and South projects. That process resulted in scientifically supported and comprehensively documented conclusions that the North and South projects will not result in significant impacts. TxDOT appropriately made informed and reasonable choices among a breadth of closely studied alternatives, documented those choices and their lack of impact in thorough yet concise environmental assessments, and kept the affected Texas public fully apprised and involved. NEPA requires no more. Plaintiffs cannot carry their burden of showing Defendants acted arbitrarily or capriciously, and judgment in TxDOT's favor is warranted as a matter of law.

## BACKGROUND

### I.   LEGAL FRAMEWORK

NEPA mandates an environmental impact statement (EIS) only if a proposed project involves "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C). To decide if an EIS is needed, an agency first prepares an environmental assessment (EA) to "provide sufficient evidence and analysis for determining whether to prepare" an EIS; if it determines it need not do so, the agency makes a finding of no significant impact (FONSI). 40 C.F.R. §1508.1(h);

*accord* 23 C.F.R. §771.115(c). And once an agency concludes there are no significant impacts, "no further study of the environmental impact of the project is necessary." *La. Crawfish Producers Ass'n-West v. Rowan*, 463 F.3d 352, 356 (5th Cir. 2006).

NEPA does not mandate "particular substantive results." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). NEPA just "ensure[s] that the agency will not act on incomplete information" with respect to environmental concerns. *Id*. Thus, a reviewing court's "deferential role" is "limited to ensuring that [the agency] took a 'hard look' at the environmental consequences" before finding no significant impacts triggering the EIS obligation. *Spiller v. White*, 352 F.3d 235, 240 (5th Cir. 2003).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The I-35 Capital Express Program and the CapEx North and South Projects

I-35 is a critical corridor in Austin, Texas—one of only three controlled-access facilities that cross the city north to south. ARN.6279. Since 2000, the Austin population increased by 31.6%, and that increase has likewise increased traffic volumes. ARS.3235. Due to existing north-south travel demands and the limited number of alternative parallel controlled-access routes, I-35 is subject to severe traffic congestion, increased crash rates, longer travel times for police, fire, and emergency medical service vehicles. ARN.6279, 6283; ARS.3236.

Because Travis and surrounding counties have dealt with I-35 traffic issues for decades, TxDOT has been studying ways to improve the corridor locally since at least the late 1980s. *See* TxDOT, *I-35 Capital Express: Program History*, https://my35capex.com/about/program-history/. With the 2008 chartering of the I-35

2

Corridor Advisory Committee, TxDOT began an intensive program of study and analysis with multiple partners, including the City of Austin and the Capital Area Metropolitan Planning Organization, that proceeded under a succession of names— Mobility35, the I-35 Capital Area Improvement Program, and, ultimately, the I-35 Capital Express, or CapEx, Program. *See id.* The aim of the CapEx Program is to improve the I-35 corridor between State Highway 45 North (SH 45N) and State Highway 45 Southeast (SH 45SE) to meet current and future traffic volumes, reduce congestion, and improve mobility and safety. ARN.6279; ARS.3235.

The CapEx Program is comprised of three projects—North, Central, and South. The genesis of TxDOT's division of I-35 between SH 45N and SH 45SE for planning purposes into three "segments of independent utility" (SIUs) was the I-35 Future Transportation Corridor Planning and Environmental Linkages study performed in 2015. ARN.48-53; ARS.1-6. The need to identify such segments arose because, "[a]fter multiple years of planning, environmental studies, schematic design, and the assessment of various funding mechanisms, TxDOT has determined that this transportation need"—relieving congestion along the I-35 corridor in Travis County— "cannot be met with a single, standalone project." ARS.7. Accordingly, taking account of federal regulatory criteria, based on operational and traffic analyses, TxDOT defined segments "such that: (1) each individual SIU could progress as a standalone project, (2) any combination of projects could be implemented in concert, and (3) all three projects would function as a cohesive system if they were all built." ARS.1. Two segments—the North and South projects—are at issue here.

3

The North project is a $390 million project that improves approximately 11.5 miles of I-35 from SH 45N to U.S. Highway 290 East (US 290E). ARN.6274, 6276. Within those limits, I-35 is a controlled-access highway, with three to four mainlines in each direction and intermittent auxiliary lanes. *Id.* The North project adds one non-tolled managed lane in each direction, reconstructs intersections and bridges to accommodate the additional lane, increases east-west mobility, reconstructs the Wells Branch Parkway interchange to a diverging diamond intersection, reconfigures ramps to accommodate mainlane improvements, and improves traffic operations and bicycle and pedestrian accommodations along frontage roads and at east-west crossings. *Id.* Drainage, which is now provided mainly by open ditches, will be converted to storm sewers, with ditches remaining in some locations. ARN.6277.

The South project is a $388 million project to improve approximately 10 miles of I-35 from U.S. Highway 290 West/State Highway 71 (US 290W/SH 71) to SH 45SE, with a transition area extending to Main Street in Buda. ARS.3231, 3234. Within those limits, I-35 is a controlled-access highway with three to four mainlines and two frontage road lanes in each direction. *Id.* The South project is phased and will add two non-tolled managed HOV lanes in each direction, reconstruct intersections and bridges to increase clearance and east-west mobility, and improve bicycle and pedestrian accommodations along frontage roads and at east-west crossings. *Id.*

### B.   TxDOT's NEPA Reviews of the CapEx North and South Projects

Both the North and South projects are "major federal actions" subject to NEPA because they are federally funded. *See* 42 U.S.C. §4332(2)(C). TxDOT is the action agency with responsibility for NEPA compliance pursuant to a Memorandum of

Understanding between TxDOT and the Federal Highway Administration (FHWA) that was most recently renewed in 2019. *See* Dkt. No. 5 ¶22.

TxDOT began environmental studies for both projects in 2019. For the North project, that meant, inter alia, multiple Tier I site assessments, historical studies and a historical resources survey, surface water analysis, hazardous materials site assessments, risk assessment for cumulative impacts, archaeological background study, traffic noise technical report, traffic air quality analysis, quantitative technical report on mobile source air toxics (MSATs), Section 106 consultations with stakeholders, analyses of affected species, and community impacts assessment.[1] For the South project, TxDOT's environmental reviews encompassed, among other items, historical studies and a historical resources survey, Section 106 consultations, a surface water analysis, hazardous materials site assessments, an affected species analysis, a technical report on community impacts, a species-focused Tier 1 site assessment, air quality analyses and reports on carbon monoxide and MSATs, a traffic noise technical report, an environmental justice assessment, and an archaeological background study.[2]

---

[1] ARN.600-764, 5061-229, 5530-38, 6050-60, 6091-113 (Tier I SAs); 517-97, 2739-863, 4943-44, 4948-52, 5232-33 (historic resources); 765-70 (surface water); 771-2733, 3039-4901, 5539-86, 5909-20 (hazardous materials); 2734-38, 4983 (cumulative impacts); 2867-914 (archaeology); 2915-3015, 5921-6023 (noise); 4902-42 (air quality); 4984-5060 (MSATs); 4948-52, 5232-37 (§106); 598-604, 722-64, 4953-82, 5222-31, 5900-07, 6050-57, 6061-90 (species); 3016-38, 5238-318 (community impacts).

[2] ARS.234-54, 262-84, 1838-89 (historic resources); 255-57, 2049-52, 3620-21 (§ 106); 285-90 (surface water); 356-1353, 2989-3008 (hazardous materials); 1993-2048, 2981-88, 3126-70 (species); 1895-992, 2189-288 (community impacts); 1995-2048, 2971-80 (Tier I SAs); 2053-126 (air quality); 2127-88 (MSATs); 2289-312, 3010-121 (noise); 2615-44 (environmental justice); 345-55, 3173-93 (archaeology).

TxDOT compiled the results of those environmental studies, and additional analysis, into a draft EA for each project, each of which was subsequently revised based on stakeholder and public input, then finalized and published. ARN.5322-529; ARS.2315-614. For each of the North and South projects, after proper agency coordination, considering the numerous scientifically supported technical reports and assessments it had solicited and prepared, and considering alternatives and copious public feedback, TxDOT found that they would not result in a significant impact on the human or natural environment and issued separate FONSIs for them on December 17 and 21, 2021, respectively. ARN.6338; ARS.3292.

Plaintiffs filed suit June 26, 2022. Plaintiffs assert TxDOT (1) improperly segmented the component projects of the CapEx Program, including the North and South projects, (2) violated NEPA by failing to prepare an EIS for either project, (3) failed to take a "hard look" at either project's cumulative impacts, and (4) failed to comply with NEPA's full-disclosure requirement. Dkt. No. 1 (Compl.) ¶¶17, 39-74. Defendants answered, Dkt. No. 5, and lodged separate administrative records for the North and South projects, *see* Dkt. No. 6. The case is accordingly ripe for disposition.

## STANDARDS GOVERNING THIS MOTION

The Administrative Procedure Act authorizes courts to set aside a final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§704, 706(2)(A). An action may meet that standard if the agency relied on extraneous factors in reaching its decision, entirely failed to consider an important aspect of the problem, or justified its decision with an explanation that runs counter to the evidence or that is so implausible it could not be

the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Conversely, the action must be upheld so long as "the agency considered the relevant factors in making the decision, its action bears a rational relationship to the statute's purposes, and there is substantial evidence in the record to support it." *Medina Cnty. Envt'l Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010) (*MCEAA*). Thus, an agency's "reasons and policy choices" need only "satisfy minimum standards of rationality." *Id.* The agency's decision is presumed valid, and the burden to overcome that presumption is heavy. *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 558 (5th Cir. 2014).

Review pursuant to the APA is "extremely limited and highly deferential." *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 243 (5th Cir. 2014). Such deference is at its apex when, as here, "an agency's particular technical expertise is involved." *MCEAA*, 602 F.3d at 699. Indeed, an agency "must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, [a court] might find contrary views more persuasive." *Id.* Thus, under no circumstance may a court substitute its judgment for the agency's in the guise of review. *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 460 (5th Cir. 2016).

"In the context of a challenge under the APA, 'summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.'" *Texas v. U.S. Envtl. Prot. Agency*, 389 F.Supp.3d 497, 503 (S.D. Tex. 2019) (quoting *Blue Ocean Inst. v. Gutierrez*, 585 F.Supp.2d 36, 41 (D.D.C. 2008)). But in "a case involving

review of a final agency action under the APA," "the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record." *Stuttering Found. of Am. v. Springer*, 498 F.Supp.2d 203, 207 (D.D.C. 2007). Rather, "in evaluating a challenge under the APA on summary judgment, the court applies the standard of review from the APA." *Texas v. EPA*, 389 F.Supp.3d at 503.

ARGUMENT

## I.   TxDOT Did Not Improperly Segment the Projects Within the CapEx Program.

Plaintiffs claim TxDOT "segmented" the three independent projects within the overall I-35 CapEx Program to evade or minimize NEPA scrutiny of the North and South projects. *See* Compl. ¶¶39-48. Segmentation is "an attempt by an agency to artificially divide a 'major Federal action' into smaller components in order to avoid the application of NEPA to some of its segments." *Save Barton Creek Ass'n v. Fed. Hwy. Admin.*, 950 F.2d 1129, 1140 (5th Cir. 1992) (*SBCA*). Plaintiffs are wrong.

"The purpose of segmentation review" is not "to decide whether or not an agency drew the correct lines when putting boundaries on its projects. Rather, 'segmentation analysis functions to weed out projects which are *pretextually* segmented, *and* for which there is no independent reason to exist.'" *Hwy. J Citizens Grp. v. Mineta*, 349 F.3d 938, 962 (7th Cir. 2003) (quoting *SBCA*, 950 F.2d at 1140; first emphasis added). To determine whether a highway-construction project has been improperly segmented, the Fifth Circuit mandates use of a four-part test, based on 23 C.F.R. §771.111(f), that "asks whether 'the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity

8

to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects.'" *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 236 (5th Cir. 2007) (quoting *SBCA*, 950 F.2d at 1140). "In the context of a highway project within a single metropolitan area—as opposed to projects joining cities"—courts "focus primarily on the independent-utility factor while assigning the other factors modest weight." *Fath v. Tex. Dep't of Transp.*, No. 1:16-cv-00234-LY, 2017 WL 11633327, at *4 (W.D. Tex. Aug. 4, 2017) (citing, inter alia, *SBCA*, 950 F.2d at 1140). Ultimately, segmentation "is improper only if the project 'has *no* independent justification, no life of its own, or is simply illogical when viewed in isolation." *Aquifer Guardians in Urban Areas v. Fed. Hwy. Admin.*, 779 F.Supp.2d 542, 567 (W.D. Tex. 2011) (*AGUA*) (quoting *SBCA*, 950 F.2d at 1140).

Plaintiffs first argue that the North and South projects lack independent utility because, allegedly, their respective purposes will only be "fully address[ed]" if all three CapEx Program projects are built. Compl. ¶43. But the main thrust of their complaint is TxDOT's purported restriction of alternatives. *Id.* ¶¶44-47.[3] In neither respect, for neither project, however, did TxDOT "ignore, or give insufficient weight to, the factors set out" in FHWA's regulations "in an attempt to avoid the requirements of NEPA." *Hwy J*, 349 F.3d at 962.[4] To the contrary—the

---

[3] Plaintiffs address only the second and third factors of the *SBCA* analysis, making no assertion that either project is improper with respect to the other factors—logical termini and irretrievable commitment of funds. In any event, on this record, no such claim could plausibly succeed. To spare the Court unnecessary briefing, at this time TxDOT will reserve further argument on those issues, without prejudice to Plaintiffs attempting to raise them later.

[4] Briefly, Plaintiffs suggest that a CEQ regulation, 40 C.F.R. §1502.4(a), also factors into the analysis. The Fifth Circuit has made clear that, "in highway cases, the FHWA's regulation controls," to the exclusion of §1502.4(a): "When deciding if agencies improperly treated

administrative record thoroughly establishes that both the North and South projects have independent utility and do not restrict consideration of alternatives for one another or other reasonably foreseeable transportation projects, including the ongoing Central project.

### A.     The North and South Projects Each Have Independent Utility.

Plaintiffs bear a heavy burden to prove that the North and South projects lack independent utility, and their allegations do not approach the demonstration required. "The proper question" for the agency with respect to independent utility "is whether [a] project serves a significant purpose even if the other related projects, the other segments, are not built for a long time or perhaps not at all." *SBCA*, 950 F.2d at 1141. However, an agency, not a court, must resolve that question; accordingly, under the APA, the Court's "review is not to determine whether the defendants made the best choice" in answering that question, "but only whether they made a choice that was informed and reasonable." *Hwy. J*, 349 F.3d at 963. Here, TxDOT did.

As the ARs document, prior to identifying and defining potential segments, TxDOT performed "operational and traffic analyses" through the entire I-35 corridor in Travis County to determine if "transportation improvements within the limits of each of the segments both could operate independently as standalone projects," thereby "address[ing] relevant transportation issues even if the other segments were not built," and could also "operate as a system if they were all built." ARS.1. In that analysis, TxDOT first identified "points of major traffic generation" and other points

---

multiple highway projects as separate projects under NEPA, we . . . have considered *only* §771.111(f)." *Fath v. Tex. Dep't of Transp.*, 924 F.3d 132, 137 (5th Cir. 2018) (emphasis added).

with reasonable justifications on "an operational basis," that could potentially serve as logical termini. *Id.* From those potential termini, TxDOT selected candidates "such that each SIU" that resulted, "performing as a standalone project, attracted meaningful amounts of traffic" "in at least one direction for one or both peak periods" of daily travel, "such that active traffic management would be necessary to maintain adequate [level of service]" in the proposed segment.[5] *Id.* TxDOT interpreted this volume and pattern of use "as indicating that each of the segments provided utility to a significant proportion of at least some of the travel markets in the corridor." *Id.*; *see* ARS.2-4 (summarizing traffic modeling supporting that conclusion).

Based on that analysis supporting the segmentation of the projects within the CapEx Program, both the North and South project EAs state TxDOT's findings as to the independent utility of their respective projects. The North project "addresses specific transportation needs identified within the project limits"—specifically, it will "improve mobility and safety when compared to existing conditions," and these benefits "stand alone" and are "not dependent upon other projects [or] future actions." ARN.6277. Likewise, the South project "provides congestion relief by widening and improving the existing roadway," satisfying the project's purpose and need, "and this would be true even if no other transportation improvements occur." ARS.3234.

*SBCA* and its progeny make clear that such improvements within a segment satisfy "the significant criterion of independent utility." 950 F.2d at 1142. Like

---

[5] TxDOT recognized that the termini for its preliminary segments were for "a planning-level analysis" only, specifically allowing "further refinement [to] occur in the project-specific NEPA stage." *Id.* The northern terminus of the South project did shift in that stage, from Riverside Drive to US 290W/SH 71. *Compare* ARS.2 *with* ARS.8-9; *see* ARS.3231-34.

Segment 3 there, the North and South projects each "provid[e] effective access between two major [intersecting] highways," "serve local needs," and "relieve traffic on arterial and city streets." *Id.* And like the interchange improvements in *AGUA*, both the North and South projects "ameliorate the serious safety and congestion problems in the project area." 779 F.Supp.2d at 567. Accordingly, TxDOT's conclusions, informed by the underlying analysis, constitute reasoned justification for the determinations that the North and South projects each have independent utility; that is all the Court need consider. *See Hwy. J*, 349 F.3d at 963.

Plaintiffs' sole challenge to the projects' independent utility, meanwhile, offers no basis for overturning TxDOT's conclusions. Plaintiffs assert that "[c]ongestion will only be alleviated and mobility improved if all three segments are completed," and anything less will not "fully address congestion and mobility on I-35"; therefore, "each project—North, Central, and South—does not have independent utility." Compl. ¶43. Plaintiffs misunderstand the nature of the inquiry: "[E]ven though the Western Section might not achieve its *maximum* utility without construction of the Eastern Section, that does not necessarily lead to the conclusion that the Western Section does not have substantial independent utility." *N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F.Supp.2d 661, 683 (M.D.N.C. 2001). Plaintiffs' argument here is the same—that, without constructing all three segments of the CapEx Program, neither the North nor South projects will "fully address" the issues they aim to alleviate. But whether they fully achieve their potential utility is not determinative. Rather, the "plain language of 23 C.F.R. §771.111(f)(2) requires only"

that, to be validly segmented, a project "have independent utility, not that it attain its maximum potential utility." *Id.*

### B.     Neither Project Restricts the Consideration of Alternatives in Each Other or Any Other Projects.

Unable to sustain their burden on the key element of independent utility, Plaintiffs instead focus their arguments on a secondary consideration, whether the North and South projects restrict the consideration of alternatives. Given the two projects' independent utility, it is doubtful if even a strong showing on this point could justify reversing TxDOT's decisions. *See, e.g.*, *Fath*, 2017 WL 11633327, at *4 (assigning this factor only "modest weight"). However, the Court need not confront that issue, as here, too, Plaintiffs' arguments fail.

*SBCA* again provides a clear blueprint for the Court's analysis. So long as TxDOT reasonably concluded that each of the North and South projects "does not dictate that any other segment must be built," nor "dictate the size of a segment if built, nor control the alignment" of other projects, neither improperly restricts the consideration of alternatives. 950 F.2d at 1142; *accord, e.g.*, *AGUA*, 779 F.Supp.2d at 567 ("Because the interchange project does not 'dictate' that any other specific project be undertaken, it will not 'restrict consideration of alternatives.'"). Plaintiffs argue, in only a most conclusory way, that the North or South projects restrict consideration of other projects' alternatives in these respects.

Plaintiffs' claims are far narrower than the sorts of restrictions *SBCA* would condemn. First, they complain that the North and South projects—whether one or both, they do not clarify—renders Plaintiffs' preferred alternative for the CapEx

Central project, a proposal by Reconnect Austin to bury and cap I-35 through downtown Austin, "more difficult to implement or even potentially unviable." Compl. ¶46. Next, Plaintiffs contend that, because HOV lanes must be "interconnected and must run cohesively," the goal of including such lanes in the CapEx Program's component projects restricts TxDOT's consideration of alternatives: "the alternatives analyzed and considered for each segment must all align with the alternatives considered in the other projects, which limits the alternatives for each." *Id.* ¶47. Plaintiffs characterize this as "severely restrict[ing] the number of alternatives that can be considered for each" of the CapEx Program's component projects, asserting that "the North project would restrict the alternatives considered for the Central and South projects, and vice versa." *Id.* ¶¶44-45.

None of those assertions are tenable on the administrative records before the Court. As the North and South project EAs lay out, TxDOT considered a variety of alternatives, including a no-build alternative, for each of the challenged projects. ARN.6284-85; ARS.3237-39. Notably, while both EAs reject their respective no-build alternatives, neither does so on the basis that the North or South projects are necessary to each other or to other projects, providing a key demonstration of the falsity of Plaintiffs' claim. ARN.6284; ARS.3237. Equally important, for both projects TxDOT considered multiple build alternatives, as well as variations of approach, alignment, and other details within those alternatives. ARN.6284-85; ARS.3237-39. Facets of the preliminary alternatives eliminated from consideration, moreover, were incorporated into the build alternative selected as preferred in each project. *Id.* Most

crucially, neither project EA rejected or declined to consider any alternative based on incompatibility with other components of the CapEx Program. *See id.*

The portrait Plaintiffs paint of radical limitations on design flexibility across the CapEx Program simply does not accord with reality. The North project, for instance, followed a dynamic constraint-based analysis to develop a schematic design that avoids or minimizes social, economic, and environmental impacts through "design exceptions, retaining walls, alignment shifts, and other measures." ARN.6284-85. The South project considered elevated, at-grade, and tunneled options for the managed lanes it would add to I-35, ultimately rejecting the latter two possibilities because of conflicts each posed with existing infrastructure. ARS.3238. These variations in the project designs show that neither the North nor South projects imposed anything like the design straitjacket Plaintiffs assert.

In any event, the constraints Plaintiffs allege ultimately do not rise to the level of an impermissible restriction on consideration of alternatives under controlling precedents. For instance, that the endpoints of each project—projects to redevelop an existing freeway, recall—will align with the existing highway segments may constrain potential alternatives, but do not do so *invalidly*, as the Fifth Circuit recognized in *SBCA*, because they do not "dictate" or "control the alignment" of the projects between those endpoints or others beyond them: "Even if Segments 2 and 4 were ultimately to connect with Segment 3, alternatives available for their location are many; *the regulations require no more.*" 950 F.2d at 1142 (emphasis added). Indeed, Plaintiffs are flat-out wrong in their key claim on this point, that "HOV lanes

are interconnected and must run cohesively," such that any alternatives for the North and South projects "must all align with the alternatives considered in the other projects." Compl. ¶47. As the design schematics for both the North and South projects show, however, TxDOT has proposed beginning and ending managed lanes within each project's limits, meaning they can be constructed (and will achieve the projects' purpose and need of reducing congestion within those limits) even if, for instance, no managed lanes are constructed in the Central segment. *See* ARN.6360 (siting managed-lane entrance and exit north of US 183 interchange); ARS.3342 (siting managed-lane entrance and exit south of US 290W/SH 71 interchange).

Here, just as in *AGUA*, Plaintiffs' assertions that the North and South projects "will 'invariably prejudice the alternatives' evaluated in the other [projects]," or vice versa, "is unsupported." 779 F.Supp.2d at 567. Rather, just as in *Fath*, construction of the CapEx North and South projects "does not dictate that any other segment must be built, nor does it dictate the size or features of any other project." 2017 WL 11633327, at *5. TxDOT accordingly did not improperly segment the North and South projects, or any other component of its CapEx Program.

## II.  TxDOT CONDUCTED APPROPRIATE ALTERNATIVES ANALYSES FOR THE NORTH AND SOUTH PROJECTS.

An agency's "obligation to consider alternatives under an EA is a lesser one than under an EIS." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005). Thus, an EA "must discuss alternatives to the planned action, but need not discuss all proposed alternatives." *City of Dallas v. Hall*, 562 F.3d 712, 718 (5th Cir. 2006); *see* 40 C.F.R. §1508.1(z) (defining "reasonable alternatives" as

those "that are technically and economically feasible and meet the purpose and need for the proposed action"). And the "range of alternatives that the agency must consider decreases as the environmental impact of the proposed action becomes less and less substantial." *Hall*, 562 F.3d at 718 (quoting *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994)). NEPA "does not impose a numerical floor on alternatives to be considered," and there is no numerical "bellwether of reasonableness." *Native Ecosystems*, 428 F.3d at 1246. Accordingly, "a plain reading of the regulations" allows consideration of "only two final alternatives—no action and a preferred alternative"— so long as "all reasonable alternatives have been considered and an appropriate explanation is provided as to why an alternative was eliminated." *Id.* TxDOT's alternatives analyses for the North and South projects readily pass that test.

In the North project EA, TxDOT identifies a preferred build alternative and compares its impacts to those of the required no-build baseline. ARN.6284; *see* ARN.6286-330. In addition, the EA discusses an additional "preliminary concept considered for the proposed project," which would have added a tolled express lane, rather than a non-tolled managed HOV lane, and "largely used the existing infrastructure as much as possible." ARN.6284. That concept was eliminated from further consideration "due to changes in legislation, stakeholder and public outreach, and two Value Engineering studies," but substantial elements were incorporated into the preferred build alternative. *Id.* In addition, variations on the build alternative were considered through a dynamic constraint-based engineering and environmental analysis to develop a design schematic that, through design exceptions, alignment

17

shifts, and other measures, "avoid[s] or minimize[s] impacts to the project constraints while still meeting the project purpose and need." ARN. 6284-85.

For the South project, TxDOT's EA likewise identifies a preferred build alternative and compares its impacts to those of the no-build baseline. ARS.3237; *see* ARS.3239-87. And, in addition, the EA notes TxDOT's consideration of two variants of a preliminary Alternative 1, one of which proposed adding managed lanes at grade, the other adding them "in a tunnel below grade." ARS.3238. The first of these would have "require[d] reconstruction of the $79.9 million Stassney Lane and William Cannon Drive project" and "cause[d] additional ROW impacts," leading TxDOT, ultimately, to eliminate it from further consideration. *Id.* The latter was "also found to be unviable due to conflicts with existing drainage systems and infrastructure," specifically the drainage tunnel for SH 71's depressed lanes at the I-35 interchange. *Id.* In addition, safety and value-engineering studies undertaken by TxDOT to compare the potential build alternatives demonstrated that the preferred alternative had a greater reduction in traffic conflict points, lower crash and severe-crash rates, and a higher level of safety-for-cost benefits. *Id.*

TxDOT evaluated and discussed a reasonable range of alternatives for each project, in keeping with the purpose of an environmental assessment under NEPA. It articulated its rationales for eliminating from further consideration certain preliminary alternatives, and it appropriately compared the preferred build alternatives to the no-build baseline to illustrate the environmental impacts of the projects and support informed decision-making. That is all NEPA demands.

III.   **TxDOT Gave the Necessary Hard Look to All Relevant Environmental Considerations in the North and South Project EAs.**

NEPA requires agencies, through an EA, to take a "hard look" at the significance of the consequences of a proposed action before issuing a FONSI. *Spiller*, 352 F.3d at 240. That demands the agency "examine the relevant data and articulate a satisfactory explanation" for its significance finding, so that a reviewing court can "assess whether the agency's decision was based on a consideration of the relevant factors." *Sw. Elec. Power Co. v. U.S. Envtl. Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019). Nonetheless, "determining whether significance exists inherently involves some sort of subjective judgment call," and so judicial "deference to [agency] fact-finding and conclusions includes deference to their judgment as to whether any particular environmental impact of the proposed [action] rises to the level of significance." *Spiller*, 352 F.3d at 244 n.5. Under these standards, there is no serious question that TxDOT's EAs for the North and South projects satisfy NEPA.

A.   **Noise Impacts**

TxDOT complied with FHWA's "Procedures for Abatement of Highway Traffic Noise and Construction Noise" for both projects. *See* 23 C.F.R. pt. 772. Those procedures establish a three-stage noise analysis for the planning and designing of federally aided highway projects. *See Prairie Band Pottawatomie Nation v. Fed. Hwy. Admin.*, 684 F.3d 1002, 1008 (10th Cir. 2012). In doing so, TxDOT took the NEPA-required "hard look" at the North and South projects' potential noise impacts.

Under FHWA's three-step process, an agency first determines whether a proposed project will result in "traffic noise impacts," defined as "noise levels that

19

approach or exceed" a defined limit (which varies depending on land use category), or that "create a substantial noise increase over existing noise levels." 23 C.F.R. §§772.5, 772.11(a), (c)(2). This requires that the agency determine existing noise levels, predict future noise levels for each alternative under consideration and compare the existing and predicted noise levels. Second, if a project will create traffic noise impacts, "noise abatement" must be considered and evaluated for "feasibility and reasonableness." *Id*. §772.13(a). Per FHWA regulation, an abatement measure is "feasible" if it reduces the noise level at more than 50% of impacted first-row receivers by at least five dB(A) and is "reasonable" if its cost does not exceed $25,000 per benefited receptor and it meets a noise reduction design goal of 7 dB(A) for at least one receptor. *Id*. §772.13(d). Third, the agency cannot approve project and specification plans unless they incorporate feasible and reasonable abatement measures, while the agency must document all impacts for which no abatement measures are feasible and reasonable. *Id*. §772.13(g), (h). Here, TxDOT prepared Traffic Noise Technical Reports for both the North and South projects in compliance with this regulatory schema.

TxDOT prepared two technical reports on the North project's noise impacts. ARN.2915-3015, 5921-6023. In each, TxDOT measured existing noise levels along the North project using 91 representative receivers. ARN.2919-23, 5925-29. TxDOT then used computer modeling to forecast noise levels in 2038 for each project alternative without mitigating sound barriers, using projected vehicle traffic data. *Id*. Of the 91 receivers, TxDOT identified 52 with noise levels that approach or exceed abatement criteria or substantially exceed existing noise levels. ARN.5929-35. TxDOT analyzed

20

feasibility and reasonableness of abatement measures for all 52 impacted receiver locations. ARN.2923-29, 5929-35. Applying FHWA's acoustic and cost criteria, TxDOT determined that eight noise barriers, covering a total linear distance of 6,858 feet, would be feasible and reasonable. ARN.2919-2930, 5929-35. Those proposed abatement measures are incorporated in the North project EA, which also documents non-impacted and impacted receivers for which no feasible and reasonable abatement measures exist. ARN.6321-24, 6375-87.

TxDOT likewise prepared two Traffic Noise Technical Reports on the South project. ARS.2289-312, 3010-121. In each, TxDOT measured existing noise levels along the South project using 61 representative receivers. ARS.3015-18, 3025, 3267-73. TxDOT again used computer modeling to forecast 2038 noise levels for each project alternative without mitigating sound barriers. *Id*. TxDOT identified 30 receivers whose noise levels approach or exceed abatement criteria or substantially exceed existing noise levels. *Id*. TxDOT then analyzed feasibility and reasonableness of abatement measures for the impacted receivers. ARS.3017-23, 3267-73. Applying the same acoustic and cost criteria, TxDOT determined it would be reasonable and feasible to incorporate two barriers covering a total linear distance of 1,610 feet. ARS.3024, 3271. Those proposed abatement measures are incorporated in the South project EA, which again documents non-impacted and impacted receivers for which no feasible and reasonable abatement measures exist. ARS.3270-73, 3399-411.

This record establishes that TxDOT took the NEPA-required hard look at noise impacts and demonstrates that the project EAs' determinations that non-abated

noise impacts are not significant were informed, reasoned, and reasonable, not arbitrary or capricious.

### B.   Water Resource Impacts

Plaintiffs claim that the projects will significantly impact water resources and TxDOT should therefore have prepared an EIS. *See* Compl. ¶¶53-55. Specifically, Plaintiffs assert TxDOT did not consider impacts on the Edwards Aquifer transition zone in the North project EA or on twelve specific water features in the South project EA. *Id.* They are wrong.[6]

TCEQ's Edwards Aquifer Rules regulate activities that could potentially pollute the aquifer, the transition zone of which the North project overlays in part, dictating requirements TxDOT must meet to complete construction over the aquifer. ARN.6303; *see generally* 30 Tex. Admin. Code (TAC) ch. 213. As TCEQ confirmed in its review of the draft North project EA, because of the project's location and limited scope, the Edwards Rules do not require TxDOT to file an aquifer protection plan and do not mandate employment of best management practices (BMPs). ARN.5908. The purpose of the Edwards Rules is to ensure against impacts to the aquifer, and TxDOT is entitled to rely on TCEQ's expertise in determining that, because the North project will comply with the Rules, any potential impacts would not be significant. *See Bellion Spirits, LLC v. United States*, 393 F.Supp.3d 5, 13 (D.D.C. 2019) ("[A]gencies are

---

[6] Plaintiffs do not raise any challenge to TxDOT's findings that there are no impacts in either project to wetlands, rivers, harbors, floodplains, wild and scenic rivers, coastal barrier resources, international boundary and water commission, coastal zones, floodways or flood control projects, and drinking waters. ARN.6300, 6302-03; ARS.285-89, 3251-57.

entitled to rely on the expertise of another agency without sacrificing deferential review."). Accordingly, TxDOT appropriately analyzed impacts to the aquifer.

Plaintiffs' contention that TxDOT failed to analyze the South project's impacts on water features identified as "waters of the United States" (WOTUS) is equally untenable for similar reasons. TxDOT undertook a WOTUS delineation study that found twelve jurisdictional WOTUS features within the South project survey area. ARS.291-344. Plaintiffs claim that the South project impacts all twelve, but as the EA documents explain, only five will sustain any impacts at all, and those are estimated to be minimal—between 0.0002 and 0.0097 acres of impact to linear streams, for 0.0127 acres total. ARS.3251-52. Under the Clean Water Act permitting regime administered by the U.S. Army Corps of Engineers (Corps), those impacts are sufficiently de minimis so as to allow TxDOT to operate under a non-reporting nationwide permit, NWP 14, with no pre-construction notification required. *Id.* As with TCEQ's expert judgment on Edwards Aquifer impacts, TxDOT is entitled to rely on the Corps' expertise in determining that the impacts to the identified water features—ones specifically documented in the EA, after all, *because of* the hard look TxDOT gave to water-resource impacts—will not be significant and so do not require preparation of an EIS. *See Bellion Spirits*, 393 F.Supp.3d at 13. And that determination was neither arbitrary nor capricious.

### C.   Environmental Justice

Agencies must consider environmental justice (EJ) impacts of their actions as a component of their environmental analyses. Exec. Order No. 12898, 59 Fed. Reg. 7629, §3–302 (1994); *see Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232

(5th Cir. 2006). Plaintiffs contend TxDOT failed to do so, asserting that TxDOT did not address disproportionate health impacts on minority and low-income communities. *See* Compl. ¶¶71-72. Plaintiffs, again, are wrong; TxDOT's EJ analysis comports with NEPA and EO 12898. *See* ARN.6289-92; ARS.3244-46.

For the North project, TxDOT conducted an EJ study in 2021 and determined that those who live in the project area would benefit from it, including EJ populations. ARN.3016-38, 5238-318. TxDOT's study identified five businesses located in a minority EJ census geography that would be displaced. ARN.5238-318. However, these businesses—tire and truck accessory stores, and a dealership of transport temperature control systems—do not cater specifically to EJ populations, there are nearby substitutes for each displaced business, and those displaced would be eligible for relocation benefits under the Uniform Relocation Act. *Id*.; ARN.6292. TxDOT considered alternate designs to avoid displacing these businesses; however, doing so would require ROW acquisition on the other side of I-35, with equivalent or greater EJ impact. ARN.6291. TxDOT held four open-house meetings for the North project in which the public had the opportunity to discuss the impact on EJ populations, and TxDOT offered affected property owners direct meetings in March and April of 2021. ARN.5246-57. Ultimately, TxDOT reasonably determined the displacements are necessary to provide safety and operational efficiency. ARN.5246. Thus, the overall EJ impacts of the North project are not substantially disproportionate or adverse.

For the South project, TxDOT prepared two community impact assessment technical reports in January and March 2021. ARS.1895-992, 2189-288. TxDOT

determined the South project will not result in any residential or business displacement. ARS.3240. Notably, the project does not displace two apartment complexes owned by the Housing Authority of the City of Austin and an Austin Affordable Housing Authority office located next to the proposed ROW. ARS.3244. More generally, TxDOT found that while EJ populations are present in the study area, they are not concentrated at any one location or side of the South project area. ARS.3244. And while there are transit-dependent populations in the study area, they will ultimately be benefitted through improved travel times and reliability for services. *Id.* Therefore, the proposed project would not result in disproportionate adverse impacts to these populations. *Id.*

The administrative records for the North and South projects demonstrate that TxDOT reached an informed and reasonable decision that EJ populations would benefit from, rather than be disproportionately adversely affected by, the projects because they will improve traffic safety and mobility while reducing congestion, improving access to services and community resources for pedestrians and cyclists, while improving safety. ARN.6291; ARS.3243. TxDOT clearly and thoroughly considered environmental justice issues, and nothing in the record suggests TxDOT's EJ study was arbitrary or capricious in methodology, analysis, or result.

### D.   Climate Change

Plaintiffs summarily assert TxDOT did not analyze the projects' impacts on climate change because TxDOT did not address emissions that may result from the increased traffic volumes. Compl. ¶73. But the record shows TxDOT considered

25

climate change impacts sufficiently thoroughly to inform decisionmaking concerning the proposed alternatives; doing so satisfies TxDOT's NEPA responsibility.

Both EAs incorporate, rely on, and summarize the analysis contained in TxDOT's greenhouse gas (GHG) technical report. ARN.6328-30; ARS.3285-87; *see* TxDOT, Tech. Report: Statewide On-Road Greenhouse Gas Emissions Analysis and Climate Change Assessment (2018), https://ftp.txdot.gov/pub/txdot/get-involved/sat/loop-1604-from-sh16-i-35/091020-greenhouse-gas-report.pdf. The report addresses the impacts of climate change, including $CO_2$ and other on-road emissions, adaptation and resilience strategies for transportation infrastructure, and potential mitigation measures. *Id.* Built-in flexibility and elasticity are intended to consider changing scenarios, *id.*, and statewide evaluation of climate impacts is rational given the inability to discern project-level contributions to climate change, *see Coal. for Adv. of Regional Transp. v. Fed. Hwy. Admin.*, 959 F.Supp.2d 982, 1014 (W.D. Ky. 2013) (upholding agency decision that project-level analysis of GHG emissions was not necessary to NEPA review). Moreover, TxDOT may approve a project even in the absence of project-specific emissions data. *See Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280 (9th Cir.1973) (existence of uncertainty does not preclude agency action if the uncertainty has been identified). And the Court should defer to TxDOT's "judgment about the appropriate level of analysis." *N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1088 (9th Cir. 2020).

Plaintiffs assert that TxDOT "failed to provide any assessment or information" about emissions caused by increased traffic volumes, Compl. ¶73, but they do not—

and cannot, credibly—argue that the information TxDOT relied on was insufficient to "foster informed decisionmaking." *Id*. TxDOT's GHG report provides the significant hard look at climate change impacts, and the EAs' discussions represent "a reasonably thorough discussion of the significant aspects" of the problem with respect to the North and South projects. *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). Plaintiffs again fail to show TxDOT acted arbitrarily or capriciously, for the simple reason that it did not.

### E.  Construction-Related Impacts

Plaintiffs allege that TxDOT did "not acknowledge the impacts that may arise during construction." Compl. ¶74. That is just false. As appropriate for each project, TxDOT thoroughly evaluated construction-phase noise, air pollution, light pollution, vibration impacts, road and bridge closures, water quality impacts, and biological impacts. ARN.6326-28; ARS.3285. NEPA does not require more.

- ***Noise:*** No noise receptors are expected to be exposed to long-duration construction noise, and no extended disruption of normal activities is expected. ARN.6237; ARS.3285. Construction will normally occur during daylight hours when occasional loud noises are more tolerable. *Id*. TxDOT will include provisions in plans and specifications requiring contractors to make every reasonable effort to minimize construction noise through abatement measures such as work-hour controls and proper maintenance of muffler systems. *Id*.

- ***Air Pollution:*** Temporary increases in particulate matter emissions will be minimized using control measures required by TxDOT standard specifications. ARN.6327; ARS.3285. TxDOT will encourage contractors' use of financial incentives from the Texas Emission Reduction Plan and other programs to reduce vehicle and equipment emissions. *Id*. Based on these measures, and the temporary and transient nature of construction-related emissions, no substantial construction-related air quality impacts are expected. *Id*.

- ***Light Pollution:*** Most construction will occur during daylight hours; if construction occurs at night, it will be of short duration and follow all local

policies and ordinances, including light limitations, to minimize impacts to nearby businesses and residents. ARN.6326; ARS.3285.

- *Vibration:* TxDOT does not anticipate excessive vibration from construction, any vibration would be of short duration, and activities will be limited to the projects' footprints. ARN.6326; *see* ARS.3272, 3285.

- *Traffic Disruption:* Traffic will follow existing patterns during construction. ARN.6327-28. Residents and businesses in the immediate area will be notified in advance of proposed activity, and any inconvenience to motorists from lane or cross-street closures will be of short duration and minimized through provision of alternate routes. *Id.* TxDOT will prepare and implement traffic control plans in coordination with local authorities, schedule cross-street closures so only one crossing in an area is affected at a time, and use clear, visible signage for alternate routes. *Id.* Access to businesses and residences would be maintained at all times, and access to existing public and community services, commercial areas, and employment centers will not be restricted. *Id.*

- *Water Quality:* Construction-phase water quality impacts will be restricted pursuant to TxDOT's NWP 14 permit and coordinated with or permitted by the Corps as necessary. ARN.6328; ARS.3252-54. TxDOT will require compliance with the State Water Quality Certification Program and implementation of BMPs from the TCEQ 401 Water Quality Certification Conditions for NWPs. *Id.* No construction equipment, spoiled materials, supplies, forms or buildings will be placed or stored in floodways. *Id.* TxDOT's Plans, Specifications, and Estimates Manual and related controls will ensure contractor compliance with the TCEQ Construction General Permit under the TPDES system. ARS.3255. Accordingly, TxDOT anticipates no significant water-quality impacts during construction.

- *Biological Impacts:* Disturbances to wildlife and vegetative communities could result but effects will be largely temporary. ARN.6328; ARS.3257-62. TxDOT will restore, reseed, and recontour as necessary according to standard specifications to ameliorate any temporary loss of habitat. *Id.*

Given its thorough analysis of construction-related impacts, planning of mitigation measures, and identification of ordinances, regulations or policies to be followed, TxDOT reasonably concluded that any construction-related impacts are not significant, and those that may occur are outweighed by the project benefits. As the record establishes, TxDOT's consideration was neither arbitrary nor capricious.

### F.      Cumulative Effects

Finally, contrary to Plaintiffs' assertions, TxDOT's hard look at the impacts of the North and South projects appropriately encompassed cumulative effects—those that "result from the incremental effects of the action when added to the effects of other, past, present, and reasonably foreseeable actions." 40 C.F.R. §1508.1(g)(3). Indeed, both project EAs address cumulative effects directly and specifically. ARN.6325-26; ARS.3282-85.

As to each project, TxDOT examined the scope and scale of potential impacts and determined that, because they would cause neither direct nor indirect impacts, the projects would not contribute to any significant cumulative effect. *Id.*; *see* ARN.2734-36. TxDOT further considered the potential for non-significant impacts to resources in "poor or declining health" within the projects' respective areas—specifically, jurisdictional "waters of the United States" and, for the South project, federally listed threatened and endangered species. ARN.6326; ARS.3283. As the EAs explain, however, TxDOT rationally determined that those de minimis impacts would not contribute to cumulative effects rising to the level of significance, either because the projects would operate within regulatory guidelines imposed to protect those resources or because there would be no such impacts in the first place. *Id.* Thus, any project impacts potentially contributing to cumulative effects on waters of the United States "would not exceed specified limits" under NWP 14 permits issued by the Corps under the Clean Water Act. *Id.* And there would be no impacts to listed species because there is no suitable habitat present in the South project area, the project will not induce growth that will indirectly result in impacts, and any such indirect impacts

29

would be prevented or mitigated by other developments' compliance with the Endangered Species Act. ARS.3283.[7] Accordingly, TxDOT found that full cumulative impacts analyses were not required and concluded that no significant cumulative effects will occur as a result of either project. *See* ARN.6579-80; ARS.3610-11.

Those determinations are fully justified under the law. A "full analysis" of cumulative effects "is unnecessary" when the agency "does not expect a project to have any significant environmental impact that can 'accumulate' with the impacts of other actions." *Fath*, 924 F.3d at 139.[8] Given that, an exhaustive cumulative-impacts analysis "would serve no purpose," violating the "rule of reason" "inherent in NEPA and its implementing regulations." *Id.* (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004); cleaned up). Here, as in *Fath*, the North and South projects are in areas "that [are] already heavily developed and trafficked," and after "conducting a number of detailed technical studies, TxDOT concluded that the project[s] would not significantly impact the environment." *Id.* at 139-40. Thus, "it was not arbitrary and capricious for TxDOT to limit its cumulative impact analysis." *Id.* at 140.

---

[7] The North project likewise considered potential cumulative impacts on threatened and endangered species, but because no state or federally listed species are present in the project area, it did not consider that resource to be one in "poor or declining health." ARN.2736. Regardless, no suitable habitat for any listed species occurs in the North project area, meaning the project will not cause any impacts at all to this resource type. *Id.*

[8] This point, moreover, demonstrates why it is irrelevant whether the project EAs specifically mentioned other projects within the CapEx Program as "past, present, [or] reasonably foreseeable actions" to which the North or South projects' impacts should be added. *See* Compl. ¶65. Because no such impacts will result from the North or South projects, there are no impacts to add to *any* other action. *See Fath*, 924 F.3d at 139.

Likewise, TxDOT's conclusion that any potential cumulative effects are insignificant is not arbitrary and capricious. Deference to TxDOT's conclusions "includes deference to [its] judgment as to whether any particular environmental impact . . . rises to the level of significance." *Spiller*, 352 F.3d at 244 n.5. That deference is not overcome merely by Plaintiffs' disagreement with the conclusions TxDOT reached. *See Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 177 (5th Cir. 2000). Plaintiffs assert only one ground that might go beyond mere merits disagreement—TxDOT's acknowledgement of de minimis impacts to waters of the United States. *See* Compl. ¶64. However, a finding "that the probability of a given harm is nonzero does not, by itself, mandate an EIS," *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F.Supp.3d 101, 132 (D.D.C. 2017), because "agencies have latitude in determining whether a risk is sufficient to require the preparation of an EIS," *Spiller*, 352 F.3d at 244 n.5. TxDOT's assessment that no significant cumulative impacts will result from the North or South projects is well-supported by the record, and its determination is entitled to substantial deference.

## IV. TxDOT FULFILLED ALL PUBLIC-INVOLVEMENT AND FULL-DISCLOSURE OBLIGATIONS UNDER NEPA.

NEPA requires agencies to "inform the public that it has indeed considered environmental concerns in its decision making process." *Balt. Gas & Elec. Co. v. Nat. Res. Defense Council*, 462 U.S. 87, 97 (1983). To achieve that end, TxDOT follows public participation rules that mirror federal procedures. *See* 43 TAC §2.101. Notice and opportunity to comment on projects are central to the process, as are public meetings where agencies inform the public of project developments and alternatives,

collect comments, and address questions. *See id*. §§2.105, 2.107. The North and South project EAs confirm TxDOT's exacting compliance with these requirements.

Yet Plaintiffs complain that TxDOT somehow did not provide full and fair disclosure. *See* Compl. ¶¶67-74. Those complaints are contradicted by the EAs both in terms of substance and public involvement. Substantively, the EAs for both projects analyzed and addressed every topic about which Plaintiffs complain. *See* Part III *supra*. Procedurally, the multiple public-involvement opportunities—seven total for both projects—were widely publicized, as were event materials. *See, e.g.,* TxDOT, *I-35 Capital Express: Events*, https://my35capex.com/news-events/events/. The processes were robust and provided data, exhibits, and opportunities to ask questions of TxDOT staff. *See* ARN.151-59, 271, 485-90, 5881-91; ARS.213-21, 2941-56. Meeting notices and materials were provided in English and Spanish, and bilingual staff were present to assist communication. ARN.91, 190-200, 303-10, 5647-59, 5587; ARS.54-62, 1422-25, 2666, 2703-14. The products of these processes—copious public comments and responses—were addressed and compiled in each project's AR.

For the North project, TxDOT provided four formal public involvement opportunities. ARN.6332-33; *see* ARN.54-160, 161-271, 277-516 (Aug. 2016, Feb. 2017, and Oct. 2019 meeting reports); ARN.5587-899 (May 2021 hearing report). Comments at the 2016 and 2017 meetings centered largely on tolling, cross-street connections, redirection of trucks to SH 130, and bicycle and pedestrian needs. ARN.108-43, 225-58. By October 2019, TxDOT had eliminated tolling and replaced it with non-tolled HOV lanes, so comments then were on variably priced express and

HOV lanes, transit, noise, speed limits, and bicycle and pedestrian needs. ARN.370-464. After the final EA was made available, TxDOT conducted a hybrid in-person and virtual public hearing event in May 2021 to present the proposed decision. ARN.5587-899.[9] Fifty-three comments were received, most covering topics raised at the prior meetings. ARN.5763-804. In addition, TxDOT met with affected property owners in March and April of 2021. ARN.5246. TxDOT also regularly updated stakeholders on project progress, solicited design feedback, and had regular meetings with the City of Austin as the project schematic was developed. ARN.6332.

For the South project, TxDOT provided three formal public involvement opportunities. ARS.3287-89; *see* ARS.12-233, 2666-970 (Oct. 2019 and Dec. 2020 meeting reports); ARS.1354-837 (Apr. 2021 hearing report). Comments at the October 2019 public meeting addressed exits, signage, and crossings; tolling, HOV, and non-tolled options; multimodal, public transit, safety, and bicycle options; light pollution, climate change, noise, and trees; congestion relief; and mainlane elevation. ARS.140-51, 153-59, 163-85. The comments prompted a redesign to extend the fourth mainlane farther south in both directions, alter operations at William Cannon Drive to relieve frontage road congestion, and add improvements between SH 45SE and Main Street in Buda. ARS.3288. The December 2020 virtual stakeholder meeting presentation yielded 572 views, more than 300 views of English and Spanish YouTube videos, and 271 more public comments. *Id.*; ARS.1461-755. Responsive design changes were again made to alleviate frontage road congestion and to add mainlane and frontage capacity

---

[9] The public hearing was held in-person on May 10, 2021 with four people attending; the virtual event had 1,990 page views between May 10 and June 10, 2021. ARN.5587.

and noise barriers. ARS.3288. Additionally, in response to concerns about elevated mainlanes, TxDOT engaged the UT Center for Transportation Research to perform an independent analysis, which concluded that the surrounding community would remain intact and would have continued access to services if the project were built. *Id*. After the final EA was made available, TxDOT conducted a hybrid public hearing in April and May 2021. ARS.5587-899.[10] Seventy-eight comments were received covering the same topics as the prior two meetings. ARS.3290.

TxDOT afforded ample opportunities for public involvement and provided full and fair disclosure of the projects and their impacts. Indeed, as a result of carefully considered public comments on the South project, TxDOT engaged outside study of impacts *and* changed the project design. ARS.3288. Likewise, TxDOT fully and fairly reported and considered the impacts of both projects in its decisionmaking. *See Balt. Gas & Elec. Co.*, 462 U.S. at 97. TxDOT unquestionably fulfilled its NEPA duties.

## V. BECAUSE NEITHER WILL SIGNIFICANTLY AFFECT THE ENVIRONMENT, THE NORTH AND SOUTH PROJECTS DO NOT REQUIRE PREPARATION OF AN EIS.

NEPA and its implementing regulations do not require preparation of an EIS for an action that does not "significantly affect[] the quality of the human environment." 42 U.S.C. §4332(2)(C); *see* 40 C.F.R. §1501.6(a). "In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment"—including, "as appropriate to the specific action, the affected area (national, regional, or local) and its resources"—and the "degree of

---

[10] The public hearing was held in-person on April 27, 2021 with seven people attending; the virtual event had 486 views between April 27, 2021 and May 26, 2021. ARS.2666.

the effects of the action"—including both "short- and long-term" and "beneficial and adverse" effects, as well as "[e]ffects on public health and safety." 40 C.F.R. §1501.3(b). The central purpose of the EA is to "[b]riefly provide sufficient evidence and analysis for determining" whether the "significantly affecting" threshold has been crossed. *Id.* §1501.5(c)(1). An agency's informed and reasoned determination a proposed action will have no significant impact, documented in a NEPA-compliant EA, warrants a high degree of judicial deference. *Spiller*, 352 F.3d at 244 & n.5.

For each of the North and South projects, TxDOT studied, quantified, and analyzed environmental effects across eighteen different categories of potential impacts. *See* ARN.6286-330; ARS.3239-87. TxDOT documented those analyses in numerous technical reports and studies, then summarized their findings and results in project-specific EAs that meet all NEPA's requirements and satisfy all NEPA's purposes. Based on those steps, TxDOT then concluded that each project "would not result in a significant impact on the human or natural environment." ARN.6338; ARS.3292. Those determinations are informed, reasoned, correct, and entitled to substantial deference. NEPA did not require preparation of an EIS for either the North or South project, and TxDOT did not violate NEPA by issuing FONSIs for both.

## CONCLUSION AND PRAYER

For the foregoing reasons, Defendants Texas Department of Transportation and Marc D. Williams, in his official capacity, respectfully request that the Court render judgment in favor of the defendants on all claims.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

NANETTE M. DINUNZIO
Chief, Transportation Division

/s/ Lisa McClain Mitchell
LISA MCCLAIN MITCHELL
Assistant Attorney General
Texas Bar No. 90001724
CATHERINE R. FULLER
Assistant Attorney General
Texas Bar No. 24107254
*Admitted pro hac vice*
Office of the Attorney General of Texas
Transportation Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1431
Facsimile: (512) 936-0888
Email: lisa.mitchell@oag.texas.gov

RYAN P. BATES
Texas Bar No. 24055152
Bates PLLC
919 Congress Avenue, Suite 1305
Austin, Texas 78701
Telephone: (512) 694-5268
Email: rbates@batespllc.com

ATTORNEYS FOR DEFENDANTS
TEXAS DEPARTMENT OF
TRANSPORTATION AND MARC D.
WILLIAMS

36

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on the 4th day of May 2023, I served a copy of the foregoing Motion for Summary Judgment via the Court's electronic filing system on all attorneys of record, as follows.

Charles Irvine
IRVINE & CONNER PLLC
4709 Austin Street
Houston, Texas 77004
charles@irvineconner.com

*Counsel for Plaintiffs*
*Rethink35, Texas Public Interest*
*Research Group, and Environment Texas*


/s/ Lisa McClain Mitchell
LISA MCCLAIN MITCHELL